JOSEPH BIONDO, Appellant, *v.* CITY OF ROCHESTER et al., Respondents.

Fourth Department, February 21, 1963.

*Berger, Kennedy & Keigher* (*John J. Keigher* of counsel), for appellant.

*Cohen, Gould, Farbo & Gleiner* (*Hyman G. Gould* of counsel), for Rae-Bon Construction, Inc., respondent.

*Arthur B. Curran, Corporation Counsel,* for City of Rochester, respondent.

*Ark, Brennan & Centner* (*J. Paul Brennan* of counsel), for Fidelity & Deposit Co. of Maryland, respondent.

BASTOW, J. On February 28, 1958 the defendant, City of Rochester, (herein " city ") and defendant, Rae-Bon Construction, Inc. (herein " Rae-Bon ") entered into a contract in writing for the performance by Rae-Bon of certain work, including excavation, laying of sewers, paving and installation of concrete curbs, gutters and sidewalks on a public street in the city. The contract price, as adjusted, was $32,070.17. There is no dispute that plaintiff performed a portion of Rae-Bon's contract and installed the concrete curbs, gutters and sidewalks.

In this action plaintiff seeks to enforce a lien against the public improvement for a claimed unpaid balance of $2,452.82 for such labor and services. It is not disputed that this amount remains

unpaid. The area of disagreement is whether plaintiff performed the work as a subcontractor of Rae-Bon or as a subcontractor of a third party, Case Excavating, Inc. (herein "Case"), which in turn was a subcontractor of Rae-Bon.

Following a nonjury trial, the court found that in April, 1958 Rae-Bon and Case entered into a written agreement by the terms of which Case agreed to perform in its entirety Rae-Bon's prime contract with the city. The latter instrument contained provisions that the contractor might not assign or sublet the contract without the previous written consent of the City Comptroller and that "All sub-contractors must be approved by the Commissioner" of Public Works of the city. The trial court found that such approval had been granted and made a further finding that the provision requiring "written approval of performance" had been waived. It was further found that in May, 1958 Case "sublet" to plaintiff the portion of the work for installation of cement curbs, gutters and sidewalks.

We conclude that these findings of fact are against the weight of the credible evidence and must be reversed. Justification for this action requires a recital of some of the pertinent facts. The sole stockholders of Rae-Bon were Raymond Chinappi, his wife and mother-in-law. The three were also the officers and directors. The corporation was in the general construction business and had an office in the City of Rochester. Case, on the other hand, during its short existence in 1958 was somewhat illusory. It was organized on April 28, 1958 by one Eric Ruhle, Chinappi and their respective wives. Each group owned 50% of the outstanding stock and the four constituted the board of directors. Case rented an office in the Rae-Bon building from April, 1958 to January, 1959 but the monthly rental of $75 was not agreed upon until November, 1958 and no rental statements were rendered by Rae-Bon or paid by Case until the "arrangement" between the two corporations terminated in January, 1959. Case was not identified by a sign or in any other manner in the office or building of Rae-Bon.

Case owned no equipment except some surveying instruments and a station wagon. Upon formation of the corporation it purchased a power shovel for $3,000 from Rae-Bon and in two or three weeks traded the shovel for a new one purchased on credit. In January, 1959 when the relationship between Rae-Bon and Case ended, the latter was unable to make the monthly payments of $780. Thereupon Rae-Bon took possession of the shovel and assumed the balance due under the contract but paid Case nothing for its equity in the shovel. The other equipment used by Case was rented from Rae-Bon but the monthly payments of

$1,828.67 were not fixed until November, 1958 when the relationship between the two corporations was near its end. The total of all rental accounts was deducted from the moneys Rae-Bon owed Case when they parted company in January, 1959.

It is against this background that we evaluate the sharply conflicting testimony of plaintiff on the one hand that he contracted with Rae-Bon and the testimony of Chinappi and Ruhle that the contract was made with Case. The trial court, as stated, passed upon findings and conclusions submitted by the parties but wrote no decision so we do not have the benefit of his evaluation of this and other conflicting testimony on the several issues presented. We believe the testimony of plaintiff that he contracted with Rae-Bon to perform as subcontractor a portion of the contract with the city. This agreement was reached at a meeting of the three men (plaintiff, Chinappi and Ruhle) in Rae-Bon's office. The documentary evidence establishes that plaintiff was to receive from Rae-Bon $1.70 per lineal foot for installing curbs and gutters and $1 per square foot for sidewalks. The testimony of Ruhle that the price for the gutters was $1.65 per foot and that there was no conversation about the sidewalks is unbelievable. He gave no testimony as to the agreed price of the sidewalk work or when and under what circumstances agreement was reached on this portion of the work which concededly plaintiff performed.

This conclusion is fortified by the subsequent conduct of Rae-Bon. When plaintiff went to the improvement to start work he was told by a City Inspector that he could not proceed unless certified by the city as a subcontractor. This was in May, 1958 — a month after the date of the contract between Rae-Bon and Case. Received in evidence was a letter of May 27, 1958 addressed to the City Engineer by Rae-Bon and signed by Chinappi requesting permission to use Biondo " as a subcontractor for gutters and walks on Jay Street." Such permission was granted by letter of May 28, 1958.

It is true that certain payments on account to plaintiff were made by checks drawn by Case and on one occasion one of Case's suppliers was paid by check of Case at the request of Biondo. This, however, has small probative weight once it is determined there was a contract between Biondo and Rae-Bon. The same may be said about the certificate of insurance issued by plaintiff's insurance agent to Case and not to Rae-Bon. Biondo told Chinappi to telephone the former's agent and the certificate would be issued. There is no proof that plaintiff directed his insurance agent to issue a certificate describing Case as a party to Biondo's subcontract. This was an ex parte act on the part

of Chinappi and it cannot be found that it was done with the knowledge and consent of Biondo.

In any event the standing of Case to enter into a subcontract with plaintiff is based upon findings that Rae-Bon and Case made a written contract that the latter should perform the entire prime contract between Rae-Bon and the city and that the city waived the contract provision requiring written approval of such subcontracting. Both findings are against the weight of the credible evidence.

There is documentary proof that on April 10, 1958 Rae-Bon and Case agreed that the latter would perform all of the Jay Street improvement for the total prime contract price of $32,070.17. But the truth as to the work actually to be performed by Case emerges from the certificate of insurance issued to Rae-Bon on behalf of Case. Therein the work to be performed is described as '' sewer construction '', '' street or road paving or repaving ''. This is the remaining portion of work to be done under the prime contract that had not been subcontracted to plaintiff. Ruhle admitted on cross-examination that he always knew that the curbs, gutters and sidewalks would be performed '' by someone else because Case Excavating was not competent to do this kind of work.'' All of this fortifies the view that Rae-Bon entered into two subcontracts — one with plaintiff for installation of curbs, gutters and sidewalks; the other with Case for the remainder of the work.

Moreover, as heretofore stated, the finding that the city recognized Case as a subcontractor or waived the contract provision requiring that subcontractors be approved in writing by a named city official may not be sustained. The facts have been stated showing the formality that surrounded the acceptance by the city of plaintiff as a subcontractor. No such action was taken by Rae-Bon to have Case so approved. Both Chinappi and Ruhle were present on the job from time to time but the City Engineer testified that no subcontractor, other than plaintiff, was certified. Ruhle testified that he told a City Inspector that Rae-Bon had assigned the contract '' to me '' (Ruhle) but the inspector insisted on formal certification. Finally, on cross-examination Ruhle admitted that Case had never been certified as a subcontractor.

Rae-Bon then undertook to prove a waiver of the contract provision. Chinappi testified to a conversation with the then Deputy City Engineer in which the former inquired if Rae-Bon would be permitted to use Case to do the work. According to this version the city official '' saw no reason why that wouldn't be all right '' and told Chinappi to notify the inspector on the job

to that effect. The city official testified that he recalled no such conversation. He produced his diary and on the day in question (April 18, 1958) there was an entry of a conversation with Chinappi about the contract work but no reference to a request that Case be substituted to do the work. Upon this proof the trial court found a waiver of the contract provision.

In our opinion this finding was against the weight of the credible evidence. This informal procedure does not square with the precise action taken by Rae-Bon to obtain approval of plaintiff as a subcontractor. There, as has been heretofore stated, formal letters passed between Rae-Bon and the city before Biondo was permitted to commence work. The City Engineer testified that he had seen Ruhle on the job but did not know that he was an officer of Case. Moreover, he didn't know that Case was there in any capacity and insisted that the city was interested "as to who the subcontractor is and if we approve his work."

We conclude that much of this proof submitted by Rae-Bon was prompted by after thoughts. Once it undertook to prove that plaintiff's subcontract was made with Case and not Rae-Bon it became necessary to establish that Case was a subcontractor for the entire work and that Case had been approved by the city. Actually, Case at most was a subcontractor of Rae-Bon for the portion of the work not to be performed by plaintiff. Moreover, Case was never approved as a subcontractor by the city and the latter did not waive the contract provision requiring such approval. There is a balance due Biondo from Rae-Bon of $2,452.82 for which he is entitled at least to personal judgment against Rae-Bon.

We pass to the next question as to whether or not plaintiff is entitled to enforce his lien for labor and services against defendants, City of Rochester and Rae-Bon. Section 12 of the Lien Law provides in part that notice of lien may be filed "At any time before the construction * * * of a public improvement is completed and accepted * * * by the public corporation, and within thirty days after such completion and acceptance ".

We examine the contract between the city and Rae-Bon to ascertain its provisions relating to completion and acceptance of the work. Article 3 thereof provides in part as follows: "(a) * * * However, no Contract shall be considered completed nor shall the final estimate be made until the Commissioner or his authorized representative, has made a final inspection of all work and has certified in writing that all provisions of the specifications have been fulfilled. (b) Before the final payment is due the Contractor shall submit evidence satisfactory to the Engineer that all payrolls, material bills, *and*

*other indebtedness connected with the work have been paid,* except that in case of disputed indebtedness or liens the Contractor may submit, in lieu of evidence of payment, a surety bond satisfactory to the City guaranteeing payment of all disputed amounts when adjudicated in cases where such payment has not been already guaranteed by surety bond ". (Emphasis supplied.)

There is proof that three estimates were submitted on claim vouchers by Rae-Bon to the city and paid as follows: 1958 — June 11 partial estimate $10,764.86; August 20 partial estimate $11,096.14; September 11 final estimate $7,002.15. These amounts total $28,863.15. There was retained by the city 10% of the contract price as a reserve to guarantee the quality of the work. This amount ($3,207.02) when added to the payments produces a grand total of $32,070.17 — the contract price as adjusted. The so-called final estimate contained the following statement signed by the City Engineer — " The above Final Estimate is correct to the best of my knowledge and belief."

The trial court found these facts but refused to find that there had not been compliance by the city with the heretofore quoted provisions of article 3 of the contract. Instead it found that the contract had been fully performed and was accepted by the city by the taking of the final estimate on September 18, 1958 and that the proper city officials had so certified. Upon these facts the court, of course, found that plaintiff's notice of lien filed on April 13, 1959 was not timely because more than 30 days had passed from the found date of completion and acceptance of the work. In all of this we believe the trial court erred.

The significant date in section 12 of the Lien Law is the completion *and* acceptance by the public corporation. The requirement is in the conjunctive and both branches must be met, as questions of fact, before the time starts running. (*Milliken Bros. v. City of New York,* 201 N. Y. 65, 71; *Matter of Flushing Asphalt Corp. [Carberry],* 188 Misc. 304, 306.) " Completion refers to the termination of the physical work; acceptance to the formal act by the state or public corporation whereby it is recognized that the contractor has performed his contract, and the improvement may be taken over by the state." (Blanc, Mechanics' Liens, pp. 494–495.) The requirements as to the formalities of acceptance may be specified in the contract itself, in which case they must be followed as set forth. (*Lehigh Portland Cement Co. v. City of Poughkeepsie,* 179 App. Div. 368.)

Moreover, if the requirement is in the contract, a subcontractor may rely thereon in gauging the time within which to file his notice of lien, and until certificates of acceptance are filed as may be required, he may acquire a valid lien, regardless of actual

completion. (Blanc, Mechanics' Liens, p. 495; *Lehigh Portland Cement Co.* v. *City of Poughkeepsie, supra; Brockhurst Co.* v. *City of Yonkers,* 150 Misc. 623, 628, affd. 244 App. Div. 799, mod. on other grounds 270 N. Y. 459; *President and Directors of Manhattan Co.* v. *City of New York,* 125 N. Y. S. 2d 504, 506; *Morant* v. *Cestone Constr. Co.,* N. Y. L. J., Feb. 3, 1937, p. 591, col. 5.)

The *Lehigh Portland Cement Co.* case (*supra*) is squarely in point. There the contract provided for completion of the work and a certificate of approval signed by the City Engineer. The work was completed in October, 1914 but no certificate of approval was ever filed. In December, the prime contractor was adjudged bankrupt and in January, 1915 appellant filed its notice of lien. In modifying the judgment so as to sustain the lien the court said (p. 370): " Considering that a subcontractor has to submit to the express terms of the main contract (*Szemko* v. *Weiner,* 176 App. Div. 620), we think appellant was entitled to rely on the provision for acceptance embodied in this contract, which was on the public files of the city. The liberal construction required by section 23 of the Lien Law would not be followed by the court, if we should hold that this subcontractor had lost the right to file a lien through an acceptance of the improvement in November, without any certificate or other formal evidence, such as the contract specified."

Here there was only final inspection and payment. Two pertinent provisions of the contract were ignored. The first requires not only final inspection of the work before the contract " shall be considered completed " but also certification in writing that all specifications of the contract have been fulfilled. But most important is the requirement that " Before the final payment is due the contractor shall submit evidence satisfactory to the engineer that all payrolls, material bills, and other indebtedness connected with the work have been paid ". Proof was supplied by plaintiff that no statement certifying that all indebtedness connected with the work had been paid was obtained by the city from Rae-Bon before making final payment. Defendants were content to rest on the ipse dixit of the then City Engineer that certification by that official on the final estimate constituted compliance with the contract provisions.

The city had formally approved plaintiff as a subcontractor of Rae-Bon and thus had knowledge of his right to be paid. Compliance by the city with the contract provision requiring Rae-Bon to submit satisfactory evidence that " indebtedness connected with the work " had been paid would have revealed the fact that Biondo had not been paid. There is no proof that

there was " acceptance " of the contract work by the city within the meaning of section 12 of the Lien Law when construed in the light of the contract provisions. It follows that plaintiff's lien was timely filed.

In view of our findings and conclusions it is unnecessary for us to reach or pass upon the second cause of action in the complaint. It was erroneous for the trial court to have undertaken to pass thereon. In the second cause plaintiff sought alternative relief against defendant, Fidelity & Deposit Company of Maryland (herein " Fidelity "), under the provisions of a performance bond made by Rae-Bon, as principal, and Fidelity, as surety, and delivered to the city. The latter, as heretofore stated, had retained $3,207.02 as a reserve to guarantee the quality of the work. This amount was payable in annual installments ending in June, 1961 but there was proof upon the trial that because of this litigation the city continues to hold all of the fund. There is no proof that the amount is insufficient to satisfy the indebtedness due plaintiff. It follows that it is unnecessary to pass upon the issues presented by the second cause of action.

In passing we direct attention to the procedure adopted by the Trial Judge in passing upon requests to find. The respective requests of the parties were adequate for a determination of the factual issues. After passing thereon, however, the court directed the attorney for Rae-Ron to prepare " formal " findings. The attorney implemented this instruction by preparing an exact duplicate of his former requests to find and conclusions which were signed anew by the court. All of this was unnecessary and cast additional work upon the parties and this court. The authority cited by the trial court was decided prior to the enactment of the present Civil Practice Act. (See Civ. Prac. Act, §§ 439, 440.)

The judgment should be reversed and judgment granted plaintiff that he has a valid lien to the extent of $2,452.82, with interest and costs to be paid out of the fund in the possession of the city and if that fund is insufficient then plaintiff is entitled to personal judgment against Rae-Bon for the amount remaining unpaid.

WILLIAMS, P. J., GOLDMAN, McCLUSKY and HENRY, JJ., concur.

Judgment unanimously reversed on the law and facts, with costs to plaintiff against defendants City of Rochester and Rae-Bon Construction, Inc., and judgment granted in favor of plaintiff in accordance with the opinion. Certain findings of fact disapproved and reversed and new findings made.