OPINION OF THE COURT
Edward J. Greenfield, J.
This is one of a number of actions before the court arising out of the construction of the unique 50-story, high-rise office building at 9 West 57th Street. In this action, Fentron Architectural Metals Corp. (Fentron), a construction subcontractor, made a claim under article 3-A of the New York Lien Law, which is designed to protect contractors, subcontractors, architects, engineers, laborers and materialmen working on buildings by assuring them that all funds received by an owner in connection with an improvement of real property by way of building loans and mortgages are deemed , to be trust funds. (Lien Law, § 70.) The owner, as trustee, is obliged to use those funds solely for payments of the cost of improvements, and *394 anyone having claims for the cost of such improvements is deemed a trust beneficiary. (Lien Law, § 71.)
Fentron, which claimed at the time of the commencement of the action that it was owed $410,355.78, sued the owner, Sheldon H. Solow and his wholly owned corporations, and Diesel Construction, the general contractor, individually as beneficiary and in a representative capacity for all others similarly situated. Fentron claims that of the $75,000,000 building loan, some $23,000,000 was diverted from the trust fund by the expedient of Solow paying the sum as "ground rent” to himself. Fentron moved for the appointment of a receiver to recover those sums and asked that the trustee be directed to file an accounting, and for related relief. Solow, as trustee, has in turn cross-moved pursuant to section 77 (subd 3, par [a], cl [viii]) of the Lien Law for his discharge as trustee on the grounds that all trust assets have been properly applied and the trust terminated.
While the payment of ground rent is recognized as a "cost of improvement” (Lien Law, § 2, subd 5), the contention that ground rent payments made by the owner to himself or his nominee under a split financing arrangement, should not be so recognized and must be treated as diversions from the trust has apparently never been raised before, and presents an issue of first impression.
Upon the original motion, a reference was directed to Special Referee Frank J. McNabb to hear and report on the receipt and disbursement of trust funds. (Fentron Architectural Metals Corp. v Solow, 48 AD2d 820.) Referee McNabb held extended hearings, and issued a report which found that the complex financial transactions were not manipulations to confuse and mislead, but were for legitimate purposes, and all moneys were meticulously recorded in the books; that there was no proof of any diversion of trust funds, and recommended that the legal issue of whether payment of ground rent by the owner to himself constituted an illegal diversion of trust funds be decided by the court. The referee’s report has been confirmed by order of Mr. Justice Fraiman.
The property on which the building was built had been assembled by Sheldon H. Solow over a period of time, using some of his wholly owned corporations as his alter ego, the assemblage being covered by interim financing. The companies used for assemblage, financing, construction, leasing and management included Solow Building Co., Solow Management Co., *395 and Solovieff Realty Co. as firms under whose names Solow individually did business; Solow Building Corp., 58 Plaza South Corp., Solow Management Corp., Solow Funding Corp., Wiltshire Realty, Inc., Jericho Operating Corp., West 58th St. Leasehold Corp., and Solow Development Corp. as his wholly owned corporate vehicles; and BKL Realty Corp. set up by his attorneys and used by Solow as a dummy corporation for certain building loan transactions.
In order to stretch the debt financing of the project to the maximum, Solow employed the technique of "split” financing, separating the parcel into fee and leasehold interests, each of which could be separately financed. This is sometimes also referred to as component financing. (See 3 Harvey, Law of Real Property and Title Closing, § 944 [1976 ed].) Solow conveyed fee title to 58 Plaza South Corporation, which in turn granted a 99-year ground lease to Solow Building Corporation. The Chase Manhattan Bank then gave a commitment for a construction loan, which ultimately amounted to $75,000,000 (the trust corpus here in question), secured by a mortgage on the leasehold. Solow Building Corporation assigned its lease back to Solow individually, but each time a payment on the construction loan was to be made he assigned the leasehold to BKL Realty Corp., which received the money, indorsed the check, and reassigned the lease to Solow. He deposited the funds in the Solow Building Company account, which financed the cost of construction. A similar method was used with respect to the fee estate. Mortgage proceeds on the fee were received by 58 Plaza South Corporation, which would turn the funds over to Solow and reconvey the fee. Thus, although the conveyances and reconveyances to the various entities appear incredibly complex, it was no more so than the expert passing of a professional basketball team, where the ball changes hands quickly from player to player, one bringing the ball down court, one evading double teaming, one feinting, and one going for the basket — but with the same team in continuous possession of the ball.
Here, there were separate fee and leasehold estates, both owned by Solow. Each estate was separately financed by separate lenders. The holder of the leasehold estate (Solow) was obligated by the terms of the lease to pay ground rent to the fee owner (Solow). The payments were not illusory, they were the security against which money was loaned. It was not, in the view of the court, a secret device for milking funds or *396 cheating subcontractors of their just due. The building loan agreement which gave rise to the $75,000,000 in trust funds was on file in the county clerk’s office, where the split financing arrangement was fully disclosed, since the lease clearly provided for ground rent payments to the owner of the fee, whether Solow individually or one of his corporate nominees. (Lien Law, §§ 14-16, 73.)
Article 3-A of the Lien Law, which declares financing proceeds for a construction project to be trust funds, permits expenditure of these funds only for "cost of improvement.” (Lien Law, § 71, subd 1.) "Cost of improvement” is defined by subdivision 5 of section 2 of the Lien Law to encompass not only direct building costs like labor and materials, but architectural and surveying fees, payroll and sales taxes, insurance premiums, finders fees, interest, and specifically "ground rent”. Obviously, the cost of obtaining a building loan must be met if the improvement is to go forward, and loans are made to the fee owner who has executed a long-term lease in the expectation that ground rents will be paid regularly which will adequately cover loan repayments. Payments out of the financing proceeds are not forbidden to be made by the owner to himself. Indeed, the statute expressly contemplates reimbursement to the owner for costs of improvement incurred prior to the date advances were received.
Although denominated a trust fund, not only may the trustee reimburse himself, but he need not hold the fund intact, and he may commingle the funds. (Aquilino v United States of Amer., 10 NY2d 271, 280; Utica Sheet Metal Corp. v Schecter Corp., 47 Misc 2d 290; Lien Law § 75, subd 1.) He may treat the trust funds as running bookkeeping balances rather than as segregated accounts. (Caristo Constr. Corp. v Diners Fin. Corp., 21 NY2d 507, 512.) When the financing proceeds, or equivalent sums have been fully disbursed, the trust funds may be deemed exhausted, even if there remain subcontractors with outstanding claims. They must then look to the general funds and credit of the owner, or of his bonding company, for further satisfaction.
It is difficult to comprehend how plaintiff can contend there was a diversion, or claim to have been damaged, when, as the referee’s report makes clear, the owner’s expenses for cost of improvement came to $125,000,000, some $50,000,000 in excess of the financing proceeds which constituted the so-called trust assets. If, in fact, there had been any diversion by the *397 payment of ground rents to the owner, he more than made up for it by replacing those sums with other sums which more than restored the partially depleted trust. (Travelers Ind. Co. v Central Trust Co. of Rochester, N. Y., 47 Misc 2d 849, affd 27 AD2d 803.) "Where the amount properly going into the improvement equals the amount which, according to the building loan agreement, should go into the improvement, there is no diversion.” (United Lakeland Air Conditioning Co. v Ahneman-Christiansen, Inc., 33 Misc 2d 606, 613, affd 18 AD2d 1022.)
The ground rents in question paid during construction pursuant to the lease aggregated $23,000,000. The owner having added $50,000,000 of funds from other sources to the trust funds to pay for costs of improvement, there was no skimming off by the owner to the detriment of subcontractors. The underlying purpose of article 3-A of the Lien Law is to prevent an owner or general contractor from pocketing construction loan proceeds for his own benefit when those who have added value to the improvement are deprived of a source of payment. Although the ground rent payments were "to himself’, the owner did not improperly siphon off funds to enrich himself at the expense of the subcontractor.
The payment of the ground rent can hardly be considered a sham. For legitimate business reasons, the fee estate and the 99-year leasehold were separated. A mortgage on the fee provided funds for land acquisition. The mortgage on the leasehold made $75,000,000 available for construction. Everyone was on notice that unless ground rent of $3,000,000 a year (later revised to $3,460,000 a year) was paid, the lease would be terminated and the bank would advance no further moneys from which subcontractors could be paid. Or, if the bank foreclosed, it would assume the obligation to pay ground rent. The ground rent was not only a bona fide "cost of improvement”, but its payment was the sine qua non if any construction activity at all was to go forward.
The leasehold and the fee did not merge by virtue of common ownership — the lease explicitly so provided. They were separately mortgaged and had separate title insurance policies. While at times Solow held title to both fee and leasehold, at other times the title was in separate corporate entitles. Nothing in the Lien Law can be construed as limiting ground rent payments as legitimate "cost of improvement” only to those situations where there is no common ownership *398 of fee and leasehold. Even where there is an identity of ownership, the ground rent is not fixed solely by the owner’s arbitrary ipse dixit. The bank holding the mortgage on the fee must be concerned that the ground rentals be as high as possible, while the bank holding the mortgage on the leasehold would insist it be as low as possible. The empirical forces of the marketplace determine the point of equilibrium, even when the usual indicia of an arm’s length transaction may be lacking. To construe the Lien Law as plaintiff would have the court do would jeopardize the split financing technique so often employed in major building projects — a result neither necessitated by the language of the statute nor by the practicalities of construction financing practice.
Under the circumstances, the motion of the plaintiff, previously held in abeyance pending the referee’s report, is now denied in all respects. The cross motion of defendant Solow as owner trustee to be discharged is granted. Subdivision 3 of section 70 of the Lien Law provides that "[t]he trust of which the owner is trustee shall continue * * * until all such assets have been applied for the purposes of the trust.” It having been established that the entire trust fund of $75,000,000 and more has been expended for recognized costs of improvement, thé trust automatically terminated on the exhaustion of the funds, and there being no basis for any charge of improper diversion, the owner trustee is discharged. Plaintiff may still press its claim for sums unpaid in other litigation.